## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

RAMON MARTINEZ,

|  |  |  |
|---|---|---|
|  | Plaintiff, |  |
| v. |  | 9:15-CV-1428 |
|  |  | (MAD/ATB) |
| OFFICER MORTON, |  |  |
|  | Defendant. |  |

RAMON MARTINEZ, Plaintiff, pro se
AIMEE PAQUETTE, Asst. Attorney General for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

### REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Mae A. D'Agostino, United States District Court Judge.  In this civil rights complaint, plaintiff alleges that the defendant used excessive force against plaintiff on April 23, 2015 in violation of the Eighth Amendment. (Complaint ("Compl.") ¶¶ 6, 7) (Dkt. No. 1).

Presently before the court is the defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 33).  Plaintiff has responded in opposition to the motion, defendant filed a reply, and plaintiff has filed a sur-reply. (Dkt. Nos. 38, 39, 40).

### 1.    Facts

Plaintiff alleges that on April 23, 2015 at approximately 9:30 a.m., he was working as a porter at Midstate Correctional Facility and was assigned to clean the bathroom in area 27-1. (Compl. ¶ 6).  Plaintiff states that he began to clean the

bathroom, when defendant Officer Morton entered the bathroom, grabbed plaintiff by the neck in a "strangle hold," and tried to force plaintiff's face into the sink. (*Id.*) Plaintiff states that, when defendant Morton let go, plaintiff asked to speak with a sergeant, but was told that "one would not be made available." (*Id.*) Plaintiff claims that he was not seen by medical personnel, nor were pictures taken of his injuries until May 21, 2015.

## II.   <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is

some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## III.    Eleventh Amendment

### A.    Legal Standards

The Eleventh Amendment provides that states have immunity against suits in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). An action against state officers in their official capacities, or an action against an agency of the state, is tantamount to an action against the state. *Yorktown Medical Laboratory v. Perales*, 948 F.2d 84, 87 (2d Cir. 1991) (official capacity actions); *Santiago v. New York State Dep't of Correctional Services*, 945 F.2d 25, 28 n.1 (2d Cir. 1991) (agencies of the state).

### B.    Application

Plaintiff has named the defendant in his individual and "official" capacity. To the extent that plaintiff asserts his excessive force claim against defendant Morton in his official capacity, the Eleventh Amendment prohibits such a claim. Thus, plaintiff's official capacity claim against defendant may be dismissed.

## IV.    Excessive Force

### 1.    Legal Standards

Inmates enjoy Eighth Amendment protection against the use of excessive force,

and may recover damages under 42 U.S.C. § 1983 for a violation of those rights.
*Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  To sustain a claim of excessive force, a
plaintiff must establish the objective and subjective elements of an Eighth Amendment
claim.  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

 In order to satisfy the objective element of the constitutional standard for
excessive force, a defendant's conduct must be "'inconsistent with the contemporary
standards of decency.'" *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted);
*Hudson*, 503 U.S. at 9.  The malicious use of force to cause harm constitutes a per se
Eighth Amendment violation, regardless of the seriousness of the injuries. *Sims v.
Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (citing *Griffin v. Crippen*, 193 F.3d 89, 91 (2d
Cir. 1999)).  However, "[t]he Eighth Amendment's prohibition of 'cruel and unusual'
punishments necessarily excludes from constitutional recognition *de minimis* uses of
physical force, provided that the use of force is not of a sort repugnant to the
conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). "'Not every
push or shove, even if it may later seem unnecessary in the peace of a judge's
chambers, violates a prisoner's constitutional rights.'"  *Sims*, 230 F.3d at 22 (citation
omitted).

 The subjective element requires a plaintiff to demonstrate the "necessary level of
culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation
omitted).  The Supreme Court has recently re-emphasized that the "core judicial
inquiry" is not whether a certain quantum of injury was sustained, but rather whether
the force was applied in a good faith effort to restore discipline, or whether it was

4

applied maliciously to cause harm, regardless of the seriousness of the injury. *Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam).

In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003). The extent of the injury may be considered as one factor in determining whether the use of force could plausibly have been thought "necessary" in a particular situation. *Wilkins v. Gaddy*, 559 U.S. 37-38, 40. The extent of the injury may also give some indication of the amount of force applied and may ultimately be considered in determining damages if appropriate. *Id.*

### B.    Application

Defendant argues that plaintiff has failed to establish that there is a genuine issue of material fact regarding either the objective or the subjective prong of the test for excessive force. In support of the motion for summary judgment, defendant has filed plaintiff's deposition, dated May 26, 2017. (Def.'s Ex. A ("Morton Decl.") (Dkt. No. 33-2). In addition, the defense has filed copies of plaintiff's grievance and appeals; plaintiff's medical records for the time in question; and defendant Morton's declaration. (Def.'s Exs. B-D) (Dkt. Nos. 33-3-33-5). Defendant Morton alleges that, on the morning of April 23, 2015, he was working as an escort officer at Midstate in Building

27. (Morton Decl. ¶ 3).  At that time, plaintiff had been working under defendant Morton's supervision as a porter for "several weeks." (*Id.* ¶ 4).  Defendant Morton and another officer were in charge of plaintiff's assignment that morning. (*Id.* ¶ 5).

Defendant Morton denies that this incident ever occurred on that date.  He denies grabbing plaintiff's neck, slamming his head against the wall, and forcing his head toward the sink, and he states that he did not see any other officer touch the plaintiff on that date. (*Id.* ¶ 6).  Defendant Morton also states that plaintiff never asked to speak with a Sergeant or supervisor, nor did plaintiff request medical attention. (*Id.* ¶ 7).  Defendant Morton states that the plaintiff completed his porter duties on April 23, 2016, and he had many opportunities to request medical attention if he needed it. (*Id.* ¶¶ 8-10).

Defendant Morton points out that, at Midstate, plaintiff was housed in a "dormitory style" housing unit which allowed him the freedom to move around the facility during certain times of the day. (*Id.* ¶ 9).  During those times, plaintiff could have approached "**any** officer and/or supervisor . . . and lodge a complaint or request medical treatment." (*Id.*) (emphasis in original).  Defendant Morton also states that, if plaintiff wished medical attention at any time, he was free to fill out a "sick call request," or because he was not confined to a cell, he could have "simply walked into the medical unit at the Facility and requested treatment from staff." (*Id.* ¶ 10).  Plaintiff continued to work as a porter in Building 27 under the defendant's supervision "for several weeks after this alleged incident occurred." (*Id.* ¶ 12).  Defendant Morton states that he never threatened or retaliated against plaintiff, nor has he directed other officers

6

to do so. (*Id.* ¶ 11).

At his deposition, plaintiff testified through an interpreter, that he had never met defendant Morton prior to working for him as a porter at Midstate, and he did not work with him for very long. (Pl.'s Dep. at 21). Plaintiff testified that defendant Morton's name was given to plaintiff by an inmate who "witnessed" the incident, but plaintiff did not know the inmate's name. (*Id.*) Plaintiff states that on April 23, 2015, he was cleaning various rooms. He had finished cleaning a large room where people had meals, and then he sat in another room and waited for the guards to escort him to the next area to be cleaned. (*Id.* at 22) Defendant came to get plaintiff to take him[1] to the last room to be cleaned, but when they entered the room, "all of a sudden, he grabbed [plaintiff] by . . . the neck and he started . . . and he shook it. He banged . . . my head against the wall. So he tried to get my head inside the . . . washer," while saying "work, work" in Spanish. (*Id.* at 23).

Plaintiff also testified that he never had trouble with defendant Morton prior to this incident, and in fact, the defendant always complimented plaintiff on his work when he finished. (*Id.* at 24). Plaintiff stated that this was the first "issue" he ever had with an officer in all his life as an inmate. (*Id.* at 25). Plaintiff stated that after defendant Morton grabbed his neck, plaintiff said "okay . . . that's good," because plaintiff knew that he was not supposed to argue with the officer. (*Id.*) Plaintiff stated that defendant Morton banged plaintiff's head against the wall twice. (*Id.* at 26).

---

[1] Plaintiff testified that there were other people present, at least one inmate, and perhaps another corrections officer. (Pl.'s Dep. at 24). Plaintiff testified that he was the third one to enter the room where the incident occurred. (*Id.*)

Plaintiff then stated that "[t]he one who was working with us and experienced and witnessed all that, he told me in Spanish, wait, this guy looks like he's drunk." (*Id.*) Plaintiff then stated that defendant Morton put plaintiff's head "inside the sink," as if he were going to bang his head against the sink, but he did not hit plaintiff's head against the sink. (*Id.*)

Plaintiff testified that the incident took six or seven minutes, and speculates that defendant Morton did not do more harm because there were "witnesses there." (*Id.* at 27, 28). Plaintiff then stated that there were two more inmates present, for a total of three inmates and defendant Morton. However, plaintiff did not know either of the other two inmates' names, although plaintiff stated that the "other porter" weighed three hundred pounds and was a "black guy." (*Id.* at 28).

Plaintiff testified that "after that, all kinds of provocations and threat[s] started." (*Id.*) However, plaintiff did not testify that any "threat" or "provocation" took place until 2016, when he claims that he was sent to "building four H," a place where people were sent to be beaten. (*Id.*) Plaintiff claims that on June 16, ***2016***, more than one year after the incident that is the subject of this action, he was sent to building four H. When he arrived, plaintiff claims that "one of the rookies tried to threaten and provoke" him, but plaintiff was "sure that it was Officer Morton" who ordered the "rookie" to threaten plaintiff. (*Id.* at 28-29). Plaintiff also claimed that Officer Morton sent a rookie, who came to see plaintiff to tell him that he could not cook his meals in the microwave, although it was common for inmates to do so. (*Id.* at 29). Plaintiff never alleges that he was beaten or that any other adverse action was taken against him. Plaintiff claims are

pure speculation, and in any event, this alleged conduct occurred more than one year after the incident. There is absolutely no evidence of any connection between defendant Morton and anything that occurred in June of 2016.

When plaintiff was asked whether he was "injured" on April 23, 2015, plaintiff answered: "No." (*Id.* at 30). He stated that he "just had some bumps on [his] head like three bumps," but that when he asked to see a doctor defendant Morton refused. (*Id.*) Plaintiff later stated that he also had some "prints of the fingers [sic]" on his neck.[2] (*Id.*) Plaintiff testified that the same day, defendant Morton sent a "Spanish guy" to tell plaintiff that, if he kept "bothering," he would be sent to the "cage." (*Id.*)

Plaintiff testified that he never saw a doctor because "they" did not want to take him. Plaintiff testified that he was never confined as a result of the incident, although generally when there is such an incident, the inmate involved was "sent to the cage immediately." (*Id.* at 31). Plaintiff then stated that no photographs were taken of his injuries at the time, but on May 21, 2015, two officers were sent by Officer Sayez to get some photographs of plaintiff in his underwear. (*Id.* at 32). The guards were sent so they could "pretend" that plaintiff had been taken to the doctor. (*Id.* at 32-33).

Plaintiff testified that he did ask for "sick call" on April 23, 2015, but that defendant Morton told one of the "other prisoners," that if plaintiff kept asking for a doctor, Morton would send him to the "cage." (*Id.* at 33). Plaintiff also stated that, when the photographs were taken on May 21, 2015, there was no doctor or nurse present. (*Id.*) However, he stated that there was someone "on a computer," who wrote

---

[2] Plaintiff began by stating that he sustained some "lacerations," but then when defense counsel repeated the word "lacerations," plaintiff stated that they were "prints of the fingers." (Pl.'s Dep. at 30).

down what the officer told the individual to write. (*Id.*)  Plaintiff then stated that he was not sure who Sayez was, but he believed that Sayez was sent to investigate "this."[3] (*Id.* at 34).

Plaintiff stated that the bumps on his head had "flattened" by May 21, 2015, and any bruises on his neck had been "cleared." (*Id.*)  Plaintiff testified that he told the officers to take a picture of his "bumps," but they told him to shut up. (*Id.* at 35). Plaintiff testified that he did not get any mental health counseling as a result of this incident.[4] (*Id.* at 35-36).

Defense counsel asked plaintiff various questions about how plaintiff obtained defendant Morton's name. (*Id.* at 38-39).  In plaintiff's grievance, the defendant was not identified by name, and later, during his interview with Sergeant Duvall, plaintiff identified the officer who assaulted him as Officer "Moe." (Def.'s Ex. B at 6, 8; Pl.'s Dep. at 39).  Plaintiff testified that he had headaches which resulted from the incident.[5] (Pl.'s Dep. at 39-40).  Plaintiff also stated that he had pains in his ears, and that his "voice pitch was louder," because he felt that people could not hear him. (*Id.* at 40). Plaintiff testified that he would like a doctor to prescribe pain killers, like aspirin or

---

[3] The court notes that, according to the grievance records, Sergeant Duvall was the individual who investigated the grievance. (Def.'s Ex. B at 8-11).  The May 21, 2015 photographs were in conjunction with the investigation of plaintiff's grievance. (*Id.* at 11-13).  However, plaintiff continued to refer to an individual named "Sayez" as the person who interviewed him and took him to the "clinic." (Pl.'s Dep. at 37-38).

[4] Plaintiff mentioned that the only time that he had mental health counseling was after his mother died in 1997 or 1998. (Pl.'s Dep. at 36).

[5] The plaintiff's testimony was unclear because the interpreter stated that, when plaintiff was referring to "constant" headaches, he was "talking about other incidents after [this] one.  He says where he received kicks on his head with boots and things like that." (Pl.'s Dep. at 39-40).

Tylenol, without restricted drugs, so that he could have them in his cell. (*Id.*)

With respect to the objective prong of the excessive force test, defendant argues that, even if plaintiff's version of the incident is true, his claims must be dismissed. As stated above, de minimis uses of force do not rise to the level of an Eighth Amendment violation as long as the use of force is not "repugnant to the conscience of mankind." *Wright*, 554 F.3d at 268-69. Plaintiff alleges that defendant Morton grabbed him by the neck, and slammed his head against the wall, maybe twice. Although plaintiff also claims that defendant Morton tried to force plaintiff's head into the sink, he specifically stated that he did not hit his head on the sink, and there was no water in the sink. Thus, the only force allegedly used was grabbing plaintiff's neck in a "strangle hold" and slamming his head against the wall.

Although plaintiff testified that this took five or six minutes, the conduct described could not have taken that long, and plaintiff states that defendant Morton just let go of his strangle hold. Plaintiff alleges that he suffered bumps on his head and hand print marks on his neck, both of which were gone one month later when the officer investigated his grievance. Although the lack of injury is not fatal to an excessive force claim, the extent and nature of an injury, if any, "'is probative of the amount and type of force actually used . . . and that in turn is likely to reflect on the reasonableness of that force[.]'" *Cunningham v. McCluskey*, No. 05 Civ. 10169, 2011 WL 2791336, at *7 (S.D.N.Y. June 22, 2011) (quoting *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 390 (S.D.N.Y. 2009); *Washington v. Parr*, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008) (finding de minimis injury to be probative of de minimis

11

force)), (Rep't-Rec.), *adopted*, 2011 WL 3478312 (S.D.N.Y. Aug. 8, 2011).

Plaintiff alleges that he suffered because no one would take him to the medical department. However, defendant Morton states that, at that time, plaintiff was not confined to a cell, and during certain parts of the day, could have walked himself to the medical unit. Plaintiff also claims that he was never seen by a doctor or a nurse, and even on May 21, 2015, when the photographs were taken, there was no medical personnel present.

The medical records contradict plaintiff's allegations. Although plaintiff alleges that he was not examined until May 21, 2015, the records show that he was scheduled for a medical appointment on May 11, 2015. The plaintiff's Ambulatory Health Record ("AHR") for May 11, 2015 indicates that plaintiff did not "show" for the appointment. (Def.'s Ex. C at 1). The same AHR entry also shows that his appointment was "rescheduled" for May 15, 2015. (*Id.*) The records further establish that plaintiff was seen in the medical department on May 18, 2015, three days before the photographs were taken. (*Id.* at 2).

The May 18, 2015 AHR entry states that plaintiff had been scheduled for a complete physical examination ("PE"), but that his last "PE" was completed on November 14, 2014, so the "PE" was cancelled. (*Id.*) The record then discusses plaintiff's history of glaucoma in detail. The AHR contains no mention of assault, injuries, headaches, or pain, or anything else that might have related to the alleged assault until May 21, 2015, when plaintiff was taken to the medical department in conjunction with the investigation of his grievance. (*Id.*) Plaintiff was seen again only

for his eyes on May 29, 2015. (*Id.*)

Clearly plaintiff's allegation that he was not "seen" because no one wanted to take him to the medical department is false. Plaintiff had at least two opportunities to go to the medical department and discuss his injuries. The first time, he did not go to his appointment at all. The second time, although there are several notations on the AHR for that date, there was no discussion of any use of force or injuries resulting therefrom. In addition, although plaintiff claims that no medical personnel were present on May 21, 2015, the AHR contradicts that statement. The AHR notation, signed by a nurse, states that "no injuries, cuts, marks, [or] bruises [were] visualized [or] reported." (Def.'s Ex. C at 2). Plaintiff himself testified at his deposition that he was not "injured" on April 23, 2015. (Pl.'s Dep. at 30).

While plaintiff might argue that the photographs were taken one month after the incident, and any injuries would have healed by then, as stated above, plaintiff had ample opportunity to seek medical assistance, without the knowledge of the defendant. Plaintiff's claims of third parties conveying messages of threats that would have kept him from going to the medical department are unsupported by any evidence because plaintiff did not need to ask anyone to take him to the medical department. Plaintiff's testimony, together with all the evidence provided by defendant shows that, even if the court assumes that force was used as plaintiff has claimed, it was not force that would be "repugnant to the conscience of mankind."

In the following cases, the court granted summary judgment in instances of de minimis force: *Robinson v. Henschel*, No. 10 Civ. 6212, 2014 WL 1257287, at *7

13

(S.D.N.Y. Mar. 26, 2014) (plaintiff's hand was slammed repeatedly against the wall)

(citing *Taylor v. N.Y. Dep't of Corr.*, No. 10 Civ. 3819, 2012 WL 2469856, at *5

(S.D.N.Y. June 27, 2012) (corrections officer forced inmate's face into the wall);

*Espinal v. Goord*, No. 00 Civ. 2242, 2001 WL 476070, *13 n. 46 (S.D.N.Y. May 7,

2001) (plaintiff claimed that the officer hit him two or three times in the face, causing

his face to turn red, but resulting in no other injuries); *Yearwood v. LoPiccolo*, No. 95

Civ. 2544, 1998 WL 474073, *1, *7 (S.D.N.Y. Aug. 10, 1998) (de minimis use of force

where plaintiff alleged that "[an officer] supposedly grabbed his neck and 'started

choking [him] and [another officer] hit [him] on the right side of [his] head with a pair

of keys and [a third officer] punch[ed][him] in the mouth busting [his] bottom lip' " but

medical records did not reflect any injuries from the encounter); *DeArmas v. Jaycox*,

No. 92 Civ. 6139, 1993 WL 37501, at *4 (S.D.N.Y. Feb. 8, 1993), *aff'd*, 14 F.3d 591

(2d Cir. 1993) (de minimis use of force where inmate was "punched once and kicked

once and, consequently, suffered a bruise and an injured right knee"). "Where, as here,

a plaintiff alleges only a degree of roughness that is common in prison contexts, and

has not claimed a lasting or even fleeting injury resulting from the defendant's conduct,

courts in this circuit have routinely held that such conduct is insufficiently serious to

support an Eighth Amendment claim." *Robinson*, *supra* (quoting *Vogelfang v. Capra*,

889 F. Supp. 2d 489, 507 (S.D.N.Y.2012)). Thus, plaintiff does not meet the objective

prong of the analysis, the court need not consider the subjective prong.

In addition, although the court is not basing its decision primarily on this issue, it

is unlikely that any use of force occurred at all in plaintiff's case.  "While it is

14

undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).

Plaintiff's own testimony was conclusory and confusing.  The court understands that plaintiff was speaking through an interpreter, but he specifically testified that he was not injured other than the three bumps, fingerprints, and subsequent headaches.  In fact, when he was testifying about the constant "headaches," the interpreter stated that plaintiff was referring to a different incident in 2016, during which he was kicked in the head.  Plaintiff's allegations that the defendant "refused" to take him for medical treatment is contradicted by the fact that plaintiff was not confined to a cell during this period, and he could have simply walked to the medical unit when he was free to move about the facility.

Plaintiff's allegations of "threats" are also contradicted by the record.  Defendant allegedly sent a Spanish-speaking inmate to warn plaintiff that if he continued to ask for medical assistance, he would be sent to the "cage."  However, plaintiff filed a grievance which was investigated, and no related retaliation or threats of retaliation were alleged by plaintiff.  It is completely unclear who allegedly "warned" plaintiff, but there is no evidence to support this allegation, coupled with the fact that plaintiff could

15

have gone to the medical unit himself without asking anyone for assistance.

Plaintiff's response in opposition to the motion does not change this court's decision. Plaintiff's factual statements in his opposition papers are slightly different than his deposition testimony. Plaintiff now alleges that defendant Morton "stormed into the room," plaintiff thought his life was over, and all he could say was "[p]lease, please." (Dkt. No. 38 ¶¶ 6, 7). Plaintiff states that, after defendant Morton released plaintiff, he walked away, and "minutes" later an unidentified person told plaintiff that if he "continue[] asking to see medical or sergeant, [defendant] was going to send [him] to the box." (*Id.* ¶ 9). Then plaintiff states that "[c]ontrary to defendant's affidavit, during this event, I didn't disrespect or disobey or refuse any of his directions." (*Id.* ¶ 11).

There is nothing in defendant Morton's affidavit which asserts that plaintiff did anything wrong since defendant Morton denies that the entire incident took place. In fact, defendant Morton points out that plaintiff worked as a porter under the defendant's supervision "for several weeks after the alleged incident occurred." (Morton Decl. ¶ 12). Plaintiff's memorandum of law then argues that the defendant's claim that the incident did not occur is "squarely contradictory" to plaintiff's description of an assault, and thus, a question of material fact exists. However, the court is first basing its recommendation on the de minimis use of force/injury. The issue of whether any incident occurred is secondary to the court's findings.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No.

16

33) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: October 6, 2017

Hon. Andrew T. Baxter
U.S. Magistrate Judge